**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Kenneth BRUCE, Appellant.**

Superior Court of Pennsylvania.

Submitted June 3, 1998.

Filed Aug. 26, 1998.

Jenny Steinen, Asst. Public Defender, West Chester, for appellant.

Nicholas J. Casenta, Jr., Asst. Dist. Atty., West Chester, for Com., appellee.

Before KELLY, J., CERCONE, President Judge Emeritus, and MONTEMURO,* J.

KELLY, Judge.

In this appeal, appellant, Kenneth Bruce, asks us to determine whether a show-up conducted in a hospital waiting room was unduly suggestive and unreliable, warranting the suppression of the subsequent identification. We are also asked to determine whether appellant's conduct at the show-up constituted "concealment," thereby warranting a jury charge, which would allow the jury to infer appellant's consciousness of guilt. We hold that (1) the show-up at the Veteran's

---

* Retired Justice assigned to the Superior Court.

Administration (V.A.) Hospital was not unduly suggestive; and, (2) the totality of the circumstances demonstrates that the eyewitness' identification of appellant had sufficient indicia of reliability to warrant its admission. Also, we hold that evidence of a suspect's conduct, at a show-up, to avoid recognition and identification by an eyewitness to a crime, may support a jury instruction on "concealment" as consciousness of guilt. Accordingly, we affirm appellant's judgment of sentence entered in the Chester County Court of Common Pleas following his conviction for robbery,[1] aggravated assault,[2] and possession of an instrument of crime.[3]

The trial court has aptly summarized the facts of this case as follows

1. On June 26, 1996, at approximately 11:30 p.m., Constance Mack witnessed an assault.

2. The following day she was interviewed by Officer Stan J. Billie with respect to this incident.

3. She told the officer that she saw a white male grab a black female from behind and heard him demand money from her.

4. She also said that she saw the black female try to break away and that the assailant slit her throat in the struggle.

5. She described the perpetrator as a 20–year old white male, 5'5" tall, weighing between 140 and 150 pounds, wearing a green or brown shirt and black shorts, and carrying a back pack.

6. She also indicated that she had seen him earlier that day and had offered him a cigarette.

7. On July 1, 1996, Ms. Mack was re-interviewed by Detective O'Donnell at the West Chester police station.

8. Ms. Mack told the detective that she remembered seeing the suspect before the incident, that she had seen him in the early afternoon picking up a cigarette from the sidewalk, and that she had offered him a cigarette which he refused.

9. On July 1, 1996, Detectives Euler and O'Donnell showed Ms. Mack a photo array containing eight photographs for identification.

10. She was unable to point out [appellant]'s picture as the perpetrator of the robbery but stated that she could identify the assailant if she saw him in person.

11. The day after the photo spread, Detectives Euler and O'Donnell made arrangements with the Veteran's Administration to conduct a show-up of [appellant] at the Veteran's Administration Hospital, where he was scheduled for an x-ray.

12. Detective Euler recruited five police officers dressed in V.A. patient's clothing to sit about the waiting area where defendant was scheduled to be.

13. The witness, Ms. Mack, was told that she would be viewing several groups of people and that the person may or may not be in one or any of the groups.

14. The witness was unaware that she would be viewing only one group.

15. She was also instructed that if she recognized the person, she was to wait until the group left the area and then to tell Detective O'Donnell who she recognized.

16. Following these instructions, Ms. Mack, along with Detective O'Donnell and an administrator from the hospital, proceeded to the x-ray department.

17. The witness wore a lab coat to make her look like a prospective employee.

18. [Appellant] was one of six males in the waiting area.

19. The stand-ins were of similar height, weight, age, hair color and dress.

20. When the detectives learned that [appellant] was wearing jeans, they had a few of the stand-ins put jeans on.

---

1. 18 Pa.C.S.A. § 3701.

2. 18 Pa.C.S.A. § 2702.

3. 18 Pa.C.S.A. § 907.

21. Unbeknownst to the detectives, [appellant] was wearing jean shorts and, consequently, was the only male among the group wearing shorts.

22. During the course of the viewing, [appellant] appeared to have recognized the witness as she was looking at him.

23. [Appellant] was standing against a pillar but during the course of the viewing, changed positions and moved closer to the stand-ins who were sitting, while attempting to hide his face.

24. Detective O'Donnell did not lead the witness to the area where [appellant] had moved, but rather, the witness, on her own, moved around the pillar in an effort to get a better look at [appellant].

25. After the group walked through the x-ray department waiting area, the witness told Detective O'Donnell that she recognized [appellant].

26. The witness responded within five seconds and stated that she was positive that it was him [sic].

27. At the witness' request, the group went through the x-ray waiting area a second time.

28. At that point, [appellant] moved to the magazine rack, dropped his head down and turned his back to the witness.

29. The witness did not view any other groups.

(Trial Court Opinion, filed February 5, 1997 at 1–4).

Following appellant's arrest on July 2, 1996, defense counsel filed a motion to suppress the witness' identification testimony, alleging that it was the product of an unduly suggestive show-up procedure. The trial court denied the motion. On July 14 through July 16, 1997, appellant was tried before a jury. During the closing charge, the judge instructed the jury, over defense counsel's objection, that they could infer consciousness of guilt from appellant's actions during the show-up at the V.A. Hospital. The jury found appellant guilty of all charges. The trial court sentenced appellant to six and one-half to twenty years' incarceration. This timely appeal followed.

On appeal, appellant raises the following issues for our review:

I. WHETHER THE TRIAL COURT ERRED IN FAILING TO SUPPRESS IDENTIFICATION TESTIMONY WHICH WAS THE DIRECT RESULT OF AN UNDULY SUGGESTIVE IDENTIFICATION PROCEDURE?

II. WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT THEY COULD CONSIDER [APPELLANT]'S FAILURE TO MAKE EYE CONTACT WITH THE WITNESS WHO IDENTIFIED HIM, AS WELL AS OTHER BEHAVIOR, AS EVIDENCE OF CONSCIOUSNESS OF GUILT?

(Appellant's Brief at 2).

██ In his first issue, appellant claims that the show-up identification procedure conducted by the police at the V.A. Hospital was unduly suggestive. Appellant concludes that the suppression court erred in refusing to suppress the identification of appellant by the witness. We disagree.

In reviewing the denial of a motion to suppress evidence, "we consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted." When the evidence supports the suppression court's findings of fact on a motion to suppress, this Court may reverse only when the legal conclusions drawn from those are erroneous. However, we are bound by the [suppression] court's findings of facts only to the extent that they are supported by the record.

*Commonwealth v. Felty*, 443 Pa.Super. 559, 564, 662 A.2d 1102, 1104–05 (1995) (citations and quotation omitted).

██ Generally, "in reviewing the propriety of identification evidence, the central inquiry is whether, under the totality of the circumstances, the identification was reliable." *Commonwealth v. Meachum*, 711 A.2d 1029 (Pa.Super.1998). The question for

the suppression court is whether the challenged identification has sufficient indicia of reliability to warrant admission, even though the confrontation procedure may have been suggestive. *Commonwealth v. Thompkins*, 311 Pa.Super. 357, 363, 457 A.2d 925, 928 (1983) (citation and footnote omitted).

> Suggestiveness in the identification process is a factor to be considered in determining the admissibility of such evidence, but "suggestiveness alone does not warrant exclusion." A pretrial identification will not be suppressed as violative of due process rights unless the facts demonstrate that the identification procedure was so infected by suggestiveness "as to give rise to a substantial likelihood of irreparable misidentification."

*Commonwealth v. Sample*, 321 Pa.Super. 457, 462, 468 A.2d 799, 801 (1983) (citations and quotations omitted). In determining whether a particular identification was reliable, the suppression court should consider "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [her] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Commonwealth v. Monroe*, 373 Pa.Super. 618, 622, 542 A.2d 113, 115 (1988), *appeal denied*, 522 Pa. 574, 559 A.2d 36 (1989) (citation omitted). The opportunity of the witness to view the actor at the time of the crime is the key factor in the totality of the circumstances analysis. *Commonwealth v. Spiegel*, 311 Pa.Super. 135, 145, 457 A.2d 531, 536 (1983) (citation omitted).

█ Guided by these principles, we turn to the instant case. The testimony from the suppression hearing shows that the witness, Ms. Mack, had seen appellant earlier on the day of the robbery and that she had talked to him, offering him a cigarette. During the course of their conversation, Ms. Mack was able to get a good look at appellant's face, body build, and clothing. (N.T. October 21, 1996 at 52–54). Ms. Mack also testified that, after she witnessed the robbery and assault of the victim later that evening, she told the companion with whom she was walking, that the perpetrator was the same individual she

had seen and talked to earlier that day. (*Id.* at 52). According to Ms. Mack, the crime happened around midnight, but the light was adequate and she was able to observe the crime, which occurred nearby and lasted several minutes. (*Id.* at 63–64).

Five days after the incident, the police brought Ms. Mack to the V.A. Hospital for a line-up. The police told Ms. Mack that she would be viewing several groups of individuals and that appellant may or may not be in one or any of those groups. Ms. Mack dressed as a prospective hospital employee and entered a waiting room with six men, of similar height, weight, age, hair color and dress, were gathered. Ms. Mack immediately identified appellant as the individual who had committed the robbery on June 26, 1996. Based on these facts, we fail to see how the identification procedure at the V.A. Hospital was so infected by suggestiveness as to give rise to a substantial likelihood of irreparable misidentification. *See Commonwealth v. Sample, supra.* To the contrary, the carefully orchestrated show-up procedure, when combined with Ms. Mack's opportunity to view appellant before the commission of the crimes and at the crime scene, the accuracy of her description of appellant, her quick and certain identification of appellant at the show-up, and the brief time between the crime and the show-up, provided sufficient indicia of reliability to warrant the admission of the identification evidence. *See Commonwealth v. Thompkins, supra.* Thus, we conclude that the suppression court was correct to deny appellant's motion to suppress the identification evidence.

█ In his second issue, appellant asserts that the trial court erred in instructing the jury that they could consider appellant's actions and behavior during the show-up as evidence of consciousness of guilt. We disagree.

█ Jury instructions must be supported by the evidence of record as instructions regarding matters that are not before the court serve no purpose but to confuse the jury. *Commonwealth v. Washington*, 547 Pa. 563, 692 A.2d 1024 (1997). Generally, the trial court can use a flight/concealment jury charge when a person commits a crime,

knows that he is a suspect, and conceals himself, because such conduct is evidence of consciousness of guilt, which may form the basis, along with other proof, from which guilt may be inferred. *Commonwealth v. Hartey*, 424 Pa.Super. 29, 40, 621 A.2d 1023, 1029 (1993), *appeal denied*, 540 Pa. 611, 656 A.2d 117 (1994) (citation omitted).

Here, appellant does not contend that the trial court's charge on flight/concealment, which mirrored Pennsylvania Suggested Standard Jury Instruction 3.14 (criminal), was erroneous. Rather, appellant asserts that the trial court should not have instructed the jury on flight/concealment at all, because the instruction "prejudiced appellant's right to a fair trial in that it raised an issue that should not have been considered by the jury." (Appellant's Brief at 18). We disagree.

The record reflects that appellant's conduct at the show-up was indeed an issue at trial, as demonstrated by the conflicting testimony presented by both sides to describe and explain that conduct. The Commonwealth presented evidence from several witnesses that, during the course of the show-up, appellant dropped his head, turned his back on Ms. Mack, tried to hide behind the pillars and magazine racks in the waiting room, and attempted to conceal his face from Ms. Mack. (N.T. July 15, 1997 at 75, 102, 112, 121, 172). Appellant, on the other hand, testified that he was simply restless at the hospital's waiting room and that he was not trying to avoid Ms. Mack. (*Id.* at 226–28). Furthermore, the facts show that the police had stopped appellant on the morning following the robbery and questioned him about the crime. Therefore, appellant was wary because he knew of his involvement in the crime prior to the show-up. Following the presentation of this evidence, the trial court instructed the jury on flight/concealment as follows:

> Now, there was evidence in this case, including the testimony of Constance Mack, Robert Marshall and Detective O'Donnell, which tended to show that [appellant] avoided being viewed by Constance Mack when she passed through the x-ray room for the second time at the V.A. Hospital.

There is also evidence[,] and appellant maintains[,] that he did not do that and was not paying particular attention to Ms. Mack at the time and did not move or change his conduct due to her presence. Again, those are factual determinations for you to make. The credibility, weight and effect of this evidence is for you to decide.

> Generally speaking when a crime has been committed and a person thinks he is or may be accused of committing it and he flees or conceals himself, such flight or concealment is a circumstance tending to prove the person is conscious of guilt. Such flight or concealment does not necessarily show consciousness of guilt in every case.

> A person may flee or hide for some other motive and may do so even though innocent. Whether the evidence of flight or concealment in this case should be looked at as tending to prove guilt, depends upon the facts and circumstances of this case and especially upon motives which may have prompted the flight or concealment. You may not find [appellant] guilty solely on the basis of evidence of flight or concealment.

(N.T. July 16, 1997 at 301–02).

Our research has uncovered no case law addressing the issue of concealment as applied to the particular facts before us. "Concealment," however, connotes an attempt to hide or avoid recognition. At the show up, appellant dropped his head and turned his back on Ms. Mack, moving behind the pillars and magazine racks in the waiting room. The issue of the intent behind appellant's conduct at the show-up was actively disputed at trial and entirely a matter for the jury's consideration. *See Commonwealth v. Washington, supra.* If the jury believed that appellant's conduct in the hospital waiting room was an attempt to hide from or prevent recognition by Ms. Mack, then the jury was free to infer that appellant's conduct demonstrated his consciousness of guilt. Therefore, we conclude, the trial court was correct to instruct the members of the jury that, after weighing the evidence and assessing the credibility of the witnesses, they could

infer a consciousness of guilt from appellant's conduct at the show-up.

■ Based upon the foregoing, we hold, the totality of the circumstances confirms that the identification of appellant by Ms. Mack had sufficient indicia of reliability to warrant its admission at trial. We also hold that evidence of a suspect's conduct, at a show-up, to avoid recognition and identification, may be considered a form of "concealment," which supports a jury instruction on the conduct as evidence of a consciousness of guilt. Accordingly, we affirm appellant's judgment of sentence.

Judgment of sentence affirmed.